**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. <u>18-CR-80054-ROSENBERG</u>**

**UNITED STATES OF AMERICA**

vs.

**GABRIEL ARTURO JIMENEZ ARAY,**

 **Defendant.**
_____/

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

  The United States of America hereby files this Opposition to the defendant Gabriel Arturo Jimenez Aray's (the "Defendant") Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1). The Defendant, who engaged in a sophisticated, wide-sweeping, and serious bribery and money laundering scheme, who has served less than half of his sentence, and who is incarcerated at a facility with no known cases of inmates with COVID-19, now moves this Court to release him immediately and permanently from prison, on the grounds that (1) he is a greater risk for complications in the event that he were to get COVID-19 and (2) family circumstances involving his adult son's increased anxiety require his presence. That motion should be denied for multiple reasons.

  *First*, the defendant has not fully exhausted all his administrative rights to appeal a failure of the Federal Bureau of Prisons ("BOP') to bring a motion on the defendant's behalf and there has not been a lapse of 30 days from the receipt of such a request by the warden of the Defendant's facility.

  *Second*, while the defendant presents at least one Center for Disease Control ("CDC") risk factor for COVID-19 that presents an extraordinary and compelling reason allowing

compassionate release under the statute, he has failed to demonstrate that his family circumstances involve the extraordinary or compelling situation involving the death or incapacitation of the caregiver of the defendant's minor child. Rather, the family circumstances involve the exacerbation of his adult son's anxiety due to his adult son's inability to speak or see the Defendant as frequently as he [the adult son] would like due to COVID-19 restrictions, especially during the Defendant's recent transfer to a different correctional facility.

*Third*, and in any event, while the defendant's medical condition presents an extraordinary and compelling reason allowing compassionate release under the statute, the Defendant has failed to demonstrate that the factors in 18 U.S.C. § 3553(a) justify his release. The law requires that the same Section 3553(a) factors considered at sentencing be considered in weighing a motion for release. As noted above, the defendant has served less than half of his sentence. Release at this time, as he proposes, would not be in accord with those factors. Nor does the defendant, who bears the burden, offer a basis for the Court to find that, in fact, that he will remain at his proposed release location if his motion were granted. On the contrary, the Government understands that because the defendant is no longer lawfully in the United States, an Immigration and Customs Enforcement ("ICE") detainer would be in place upon his release; accordingly, if the defendant's motion were granted, he would be released into the custody of ICE pending deportation proceedings. The Court should not release the defendant, more than halving his sentence, given this undeniable fact.

## FACTUAL BACKGROUND

a.   *Plea*

On March 20, 2018, the Defendant pleaded guilty under seal to a one-count Information charging him with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h).

[ECF Nos. 3 and 14]. That charge was unsealed on November 20, 2018. As part of his plea negotiations with the government, the Defendant signed a factual proffer in which he admitted his criminal conduct. [ECF No. 15]. As part of the factual proffer, the defendant admitted that, as part of the scheme from 2010 until 2014, the Defendant and his co-conspirators acquired Banco Peravia in the Dominican Republic, through which he helped launder bribe money and financial scheme proceeds, in part, in the Southern District of Florida. The Defendant and his co-conspirators made the decision to use Banco Peravia to pay bribes to Venezuelan government officials in exchange for contracts to conduct currency exchange schemes and to launder the money obtained from running those currency exchange schemes. The Defendant facilitated illegal transactions and bribe payments to foreign officials and others via bank issued credit cards, cash disbursements, wire transfers and other financial transactions. [*Id.*]

      b.     *Presentence Investigation Report and Sentencing Hearing*

In advance of the Defendant's sentencing hearing, the United States Probation Office prepared a Presentence Investigation Report ("PSR") and subsequent addendums. In that report, the defendant's offense conduct was described in paragraphs 11-19, and included the facts as outlined in the Defendant's factual proffer, discussed above. In addition, the PSR, in describing the Defendant's physical condition, noted that the Defendant was 5 feet 11, weighed 220 pounds, and during the interview for the bond investigation[1], the Defendant stated he was in "good physical health." [PSR at ¶¶ 42-43] In addition, the PSR noted that the Defendant did not report any mental or emotional problems and denied abusing alcohol or illegal drugs. [*Id.* at ¶¶ 44-45] As for his family information, the PSR noted that law enforcement records indicated that the defendant was divorced, and no other information was known about the defendant's family. [*Id.* at ¶ 39] The

---

[1] Probation was unable to complete their interview of the Defendant prior to sentencing.

Defendant's guideline range was subsequently determined to be 97 months to 120 months imprisonment based, in part, on a loss amount of $38 million. At sentencing, the Defendant did not argue any medical conditions that would impact his sentencing and chose instead to focus, in part, on his family circumstances involving his son and his mental health issues since losing his mother to cancer. The Court specifically recognized the "important role [the Defendant played in his family members'] lives, and in particular the relationship [he] share[d] with [his] son, and the incredible hardship that this has and will continue to pose for [his son] and his [son's] well-being." [Sentencing Tr. (ECF No. 48) 22.] After the benefit of a sentencing hearing and consideration of the factors enumerated in § 3553(a), the Court sentenced the Defendant to 36 months of imprisonment followed by 3 years of supervised release. [ECF No. 49] The Defendant is currently serving his sentence at Moshannon Valley CI in Philipsburg, Pennsylvania.

   *c.*  *BOP's Response to The Covid-19 Pandemic*

 Here, the Defendant cannot show more than a negligible risk because his designated facility has no current COVID-19 cases, has never had an inmate test positive, and the facility follows BOP's extensive prophylactic measures. "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). "[I]n the absence of evidence to show that COVID-19 has infiltrated the facility at which a prisoner is located, there are no 'extraordinary and compelling reasons' for a court to grant a motion for a sentence reduction." *United States v. Vence-Small*, No. 3:18-cr-00031(JAM), 2020 WL 2214226 (D. Conn. May 7, 2020).

Moshannon Valley CI follows all of the BOP "Phase 9" protocols to minimize the risk of COVID-19 exposure. That modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. *See* Ex. 1 at 7. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy

Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at

18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of September 17, 2020, BOP has transferred 7,646 inmates to home confinement since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, at https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to—and for Moshannon Valley CI, among others, have succeeded to—mitigate sharply the risks of COVID-19 transmission in BOP institutions. The Defendant, however, seeks to be released to a community with actual evidence of COVID-19 spread. *See, e.g., United States v. Johnson*, No. 2:19-CR00-81-TOR, 2020 WL 2114357, at *2 (E.D. Wash. May 4, 2020) ("[W]here is Defendant safer from the threat—in a facility with no known cases, or in public with thousands of confirmed cases? Fear of the virus does not warrant immediate release."). Here, the Defendant proposes to live in Houston, Texas—assuming *arguendo* that he in fact would live where he proposes to live, rather than be transferred to ICE custody, as the United States understands would occur. As of September 22, 2020, there were 138,473 active cases in Harris County (where Houston is located) alone, and there were more than 1,700 deaths. *See* publichealth.harriscountytx.gov/Resources/2019-Novel-Coronavirus (last visited September 22, 2020 at 8:48 p.m.).

## LEGAL STANDARD

"Generally, a court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Pubien*, 805 F. App'x 727, 729 (11th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). Instead, "[t]he authority of a district court to modify an imprisonment sentence is narrowly limited by statute." *United States v. Phillips*, 597 F.3d 1190, 1194-95 (11th Cir. 2010).

7

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. Section 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id*.

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Ebbers*, 432 F.Supp.3d 421, 426 (S.D.N.Y. 2020); *see also United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[2]

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). As relevant here, family circumstances are met in the event of the death or incapacitation of the caregiver of the defendant's minor child. *Id.* at (C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

In ruling on a motion for compassionate release, a court's "task is not to second guess or to reconsider whether the original sentence was just, but to assess whether the defendant's circumstances are so changed that it would be inequitable to continue the confinement of the prisoner." *Ebbers*, 432 F. Supp. 3d at 429-30. Given the enduring importance of the § 3553(a) factors, courts have denied compassionate release motions based on the § 3553(a) factors, even where extraordinary and compelling reasons exist. *See United States v. Webster*, -- F. Supp. 3d -,

---

not entitled to file motions under § 3582(c). See First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; cf. 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

No. 3:91CR138 (DJN), 2020 WL 618828, at *6-8 (E.D. Va. Feb. 10, 2020) (denying compassionate release to defendant with terminal cancer even though court found extraordinary and compelling reasons because § 3553(a) factors weighed strongly against relief).

## ARGUMENT

### A. THE DEFENDANT'S MOTION MUST BE DENIED FOR FAILURE TO EXHAUST HIS ADMINISTRATIVE REMEDIES

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, under which the defendant here seeks relief, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." *Id*. § 3582(c)(1)(A)(i). A motion under this provision may be made by either the BOP or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id*. (emphasis added). Accordingly, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights" or the lapse of 30 days has occurred, the district court "may not" modify his term of imprisonment. In short, Section 3582(c)(1)(A)'s exhaustion requirement requires "full[] exhaust[ion]." Despite the Defendant's assertion that a request for compassionate release was submitted on May 28, 2020, the BOP reported that, as of September 23, 2020, it had not received a request for a reduction in sentence from the Defendant at either facility (Moshannon Valley or D. Ray James, which is the facility where the Defendant was previously housed and to which he claims to have submitted his request). As the movant, the defendant bears the burden to establish that he has exhausted his administrative rights and he has failed to do so here.

10

That ends this matter at this time. This is so because Section 3582(c)'s exhaustion requirement is statutory, not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). Statutory exhaustion requirements "stand[] on a different footing." *Id*. "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Id*. Thus, where a statute contains mandatory exhaustion language, as it does here, the only permissible exceptions are those contained in the statute. *Id.*; *see also Bastek v. Fed. Crop. Ins.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As described above, Section 3582(c)(1)(A) has mandatory exhaustion language with no exceptions. The plain language of the statute states that a court "may not" modify a sentence unless the defendant has first "fully exhausted all administrative rights" or waited 30 days after transmitting his request to the warden. Unlike the Prison Litigation Reform Act ("PLRA"), for example, there is no statutory qualifier that a defendant need only to exhaust all "available" remedies.[3] *Cf. Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims). For this reason, this Court lacks the authority to grant the defendant's motion at this time.

---

[3] In particular, the PLRA demands that an inmate exhaust "such administrative remedies as are available," meaning that the only permissible exception to exhaustion is where the remedies are "unavailable." *Ross*, 136 S. Ct. at 1856-58 (emphasis added); *see also id*. at 1855 (criticizing the "freewheeling approach" adopted by some courts of appeals to exhaustion requirements, and overruling precedent from the Second Circuit and other circuits that had read additional exceptions into the rule). Here, no such exception exists in the statute.

11

> **B.    THE DEFENDANT'S FAMILY CIRCUMSTANCES DO NOT CONSTITITUTE AN EXTRAORDINARY AND COMPELLING SITUATION**

The Defendant's family circumstances do not involve the extraordinary or compelling situation involving the death or incapacitation of the caregiver of the defendant's minor child as contemplated by USSG § 1B1.13, cmt. n.1(C).  Rather, the family circumstances involve the exacerbation of his adult son's anxiety due to his adult son's inability to speak to or see the Defendant as frequently as he [the adult son] would like due to COVID-19 restrictions, especially during the Defendant's recent transfer to a different correctional facility.  First, the Defendant concedes that his sister moved to the United States to care for his adult son while he was incarcerated. [ECF No. 53 at 8]  He offers no evidence of her death or incapacitation.  In fact, he concedes that he is planning on living with both of them if released.  [*Id*. at 11]  Second, he concedes that his son is an adult, not a minor child.  [*Id*. at 1]  He offers no evidence that his college-aged, adult son cannot care for himself.  Finally, the Defendant's reliance on *United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000), *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995), and *United States v. Haversat*, 22 F.3d 790 (8th Cir. 1994) is misplaced.  In *Milikowsky*, the lower court took note of the destructive effect imprisonment would have on Milikowsky's family, but found it insufficient by itself to justify a departure.  The second circuit agreed. *Milikowsky*, 65 F.3d at 6.  And unlike the Defendant's situation, the other two cases clearly fall within the scope of the extraordinary and compelling circumstances envisioned by the USSG application note.  Namely, *Aguirre* involved the death of a minor child's father and *Haverest* involved a husband's need to care for his incapacitated spouse.  None of these situations are present here and, as discussed above, BOP fully understands the hardships created by the COVID-19 pandemic and, in part, has

increased detainees' telephone allowance to 500 minutes per month in order to ensure that familial relationships are maintained throughout the disruption.

### C. THE DEFENDANT'S MEDICAL CONDITION DOES CONSTITIUTE AN EXTRAORDINARY AND COMPELLING CIRCUMSTANCE

The Defendant's application rests on claims that his age, obesity, ulcers, heart disease (described as an arrythmia and an incident in 2014), pre-diabetic state, and a mass near his lung constitute extraordinary and compelling circumstances that warrant a reduction in his sentence. There is no dispute that the Defendant's obesity, along with the Defendant's age, are COVID-19 risk factors. *See* CDC, Groups at Higher Risk for Severe Illness https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Indeed, recent records from the Defendant's incarceration, which the undersigned will file under seal as Exhibit 1, demonstrate that his weight was 222 pounds and his BMI was 31. Exhibit 1 at 1.

Therefore, the United States concedes that the Defendant presents an extraordinary and compelling reason allowing compassionate release under the statute and guideline policy statement, even if those conditions in ordinary times would not allow compassionate release. However, as stated below the United States does not believe that the Defendant qualifies for release under the totality of the policy statement in U.S.S.G. § 1B1.13.

### D. THE § 3553(a) FACTORS WEIGH AGAINST THE DEFENDANT'S RELEASE

The Defendant's motion should be denied because the § 3553(a) factors weigh heavily against the Defendant's release. The Defendant, however, claims that the § 3353(a) factors favor his release in that while incarcerated he has bettered himself through the opportunities available to

him in prison, that he has served approximately half of his sentence, and that he has a support network to help him once he is released from prison. [ECF No. 53].

The applicable § 3553(a) factors include, among others: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "(2) the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). At the time of sentencing, the Court concluded that the Defendant committed a serious corruption offense involving a position of trust and $38 million in laundered funds and that a term of imprisonment of thirty-six months was appropriate in light of these § 3553(a) considerations. To date, Defendant has served less than 50% of that sentence. Releasing Defendant this early would not adequately account for the severity of Defendant's crimes, promote respect for the law, provide just punishment for the offense, or afford adequate deterrence to criminal conduct. Moreover, the Defendant has not provided any compelling additional bases that the sentence imposed should be modified based upon the factors set forth in § 3553(a). *See United States v. Post*, No. 15-CR-80055, 2020 WL 2062185, at *2 (S.D. Fla. Apr. 29, 2020) (noting "that much of the information that [the defendant] provide[d] in his Motion was before the Court at the time of his sentencing," and the Court imposed an appropriate sentence considering this information); *United States v. Zamor*, No. 17-20353-CR, 2020 WL 2062346, at *2 (S.D. Fla. Apr. 29, 2020) ("Crucially, [the defendant] has completed less than 40% of this sentence, and the applicable 18 U.S.C. § 3553(a) factors . . . do not warrant [his] release after serving less than half of his sentence."); *United States v. Rodriguez-Orejuela*, No. 03-CR-20774, 2020 WL 2050434, at *7 (S.D. Fla. Apr. 28, 2020) (noting that, in weighing the sentencing factors, "the Court's analysis is virtually unchanged from thirteen years

14

ago."). The Defendant is not entitled to immediate and permanent release, more than halving his sentence.

## CONCLUSION

For the foregoing reasons, the Defendant's motion should be denied.

Respectfully Submitted,

| DANIEL S. KAHN | ARIANA FAJARDO ORSHAN |
| ACTING CHIEF, FRAUD SECTION | UNITED STATES ATTORNEY |

By: */s/ Paul A. Hayden*  
    PAUL A. HAYDEN  
    Trial Attorney  
    Fraud Section, Criminal Division  
    U.S. Department of Justice  
    1400 New York Avenue, N.W.  
    Washington, D.C. 20005  
    Telephone: 202-353-9370  
    Email: paul.hayden2@usdoj.gov  

By: */s/ Kurt K. Lunkenheimer*  
    KURT K. LUNKENHEIMER  
    Assistant United States Attorney  
    Court ID No. A5501535  
    U.S. Attorney's Office - SDFL  
    99 N.E. 4th Street, Suite 600  
    Miami, FL 33132-2111  
    Telephone: (305) 961-9008  
    Facsimile: (305) 536-4699  
    Email: Kurt.Lunkenheimer@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 28, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

>*/s/ Paul A. Hayden*
>PAUL A. HAYDEN
>Trial Attorney